UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ROBBIN VAZQUEZ,

                    Plaintiff,

        - against -

CITY OF NEW YORK, OBSON CESAR,
ALFREDO BREWSTER, and JANE DOE,

                    Defendants.

Civil Action No. 22-510

**COMPLAINT**

**Jury Trial Demanded**

Plaintiff Robbin Vazquez, by and through her undersigned attorneys, brings this

Complaint against Defendants the City of New York, New York Police Department Officer

Obson Cesar, and former New York Police Department Officer Alfredo Brewster, and in support

thereof alleges as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This is a civil rights action challenging the long-standing policy, custom, and

practice of the New York Police Department (the "NYPD") of obstructing and retaliating against

members of the public for exercising their First Amendment rights to film police officers

engaged in their official duties in public places.

2.      The New York State Legislature and numerous federal circuit and district courts

recognize that there is a First Amendment right to record police activity.  This basic right is

consistent with fundamental notions of liberty and serves a vital role in society—promoting the

accountability of our governmental officers and instilling confidence in the public officers who

serve us daily.

3.      Nonetheless, the NYPD has repeatedly and unlawfully retaliated against citizens

who peacefully have attempted to exercise that right.  Indeed, NYPD officers arrested Ms.

Vazquez in retaliation for her peaceful exercise of this fundamental right after she lawfully recorded police acting in their official capacity.  This retaliatory arrest was not an isolated incident.  The NYPD has long demonstrated a custom, pattern, and practice of improperly interfering with and retaliating against citizens' lawful exercise of the right to record police activity.  As the New York City Civilian Complaint Review Board (the "CCRB") has recognized, "the data supports the conclusion that officer interference with civilian recordings of police conduct is an issue in New York City."[1]

4.       This custom, pattern, and practice results from the deliberate indifference of the City of New York (the "City") and the NYPD, which in turn enables a culture amongst the ranks that disregards, often with impunity, the constitutional right to record police activity.

5.       Ms. Vazquez seeks compensatory and punitive damages for the harms she suffered as a result of Defendants' unlawful actions.

### PARTIES

6.       Plaintiff Robbin Vazquez ("Ms. Vazquez") is a 41-year-old Latina woman and dedicated mother to her 12-year-old son.  In 2019, at the time of her unlawful arrest by NYPD officers, Ms. Vazquez was a college student at the University of Phoenix and working in a mentorship role to youths in her community, through Operation H.O.O.D. (Helping Our Own Develop), an organization under the umbrella of the Cure Violence Initiative – a city-funded program aimed at preventing gun violence.  At Operation H.O.O.D., Ms. Vazquez taught anger management classes and took part in an initiative to identify and mediate conflicts among high-risk youth, mentor high-risk youth to change behaviors toward gun violence, and mobilize the community to raise awareness about violence and promote community norms that reject

---

[1] *See, e.g.*, New York Civilian Complaint Review Board, *Worth a Thousand Words: Examining Officer Interference with Civilian Recordings of Police*, June 2017, at 34.

violence.  In 2019, and at all times relevant to the Complaint, Ms. Vazquez resided in Brooklyn, New York.

7.      Defendant City of New York is a municipality of the State of New York.  The NYPD is an administrative arm of the City.  Defendant City of New York is responsible for the administration and operation of the NYPD and charged with the employment, control, supervision, discipline, and training of NYPD personnel and employees and with formulating policies, customs, and practices governing NYPD personnel and employees.

8.      Defendant Officer Obson Cesar ("Officer Cesar"), at all relevant times, was a police officer employed by the City of New York in its police department.  At all times relevant to this Complaint, he was acting under color of law and color of his authority as a police officer of the City of New York.  He is sued in his individual capacity.  His business address is 2860 West 23rd Street, Brooklyn, New York 11224.

9.      Defendant Officer Alfredo Brewster ("Officer Brewster"), at all relevant times, was a police officer employed by the City of New York in its police department.  At all times relevant to this Complaint, he was acting under color of law and color of his authority as a police officer of the City of New York.  He is sued in his individual capacity.  Upon information and belief, his personal address is 50 Kent Rd., Valley Stream, New York 11580.

10.     Defendant Officer Jane Doe, at all relevant times, was a currently unidentified police officer employed by the City of New York in its police department.  At all times relevant to this Complaint, she was acting under color of law and color of her authority as a police officer of the City of New York.  She is sued in her individual capacity.[2]

---

[2] Plaintiff intends to identify Officer Jane Doe through discovery.

## JURISDICTION

11.     Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments to the United States Constitution.  This Court has subject matter jurisdiction over all federal law claims under 28 U.S.C. § 1331.

12.     Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims in this Complaint occurred in this District and, additionally, upon information and belief, many of the defendants reside in this District.

## STATEMENT OF FACTS

### *The Arrest of Orlando Sepulveda*

13.     On February 4, 2019, around 10:30 a.m., Ms. Vazquez exited her apartment building with her son's new puppy, Biggz.  Outside, Ms. Vazquez met with her son's father, Orlando Sepulveda.

14.     Mr. Sepulveda had planned to take Biggz to the veterinarian's office that morning for his vaccinations.  Mr. Sepulveda was carrying about $100 in cash to pay for the vaccinations.

15.     While waiting for a car service to take Mr. Sepulveda and Biggz to the veterinarian, Mr. Sepulveda and Ms. Vazquez walked the puppy in front of the apartment complex.  Biggz relieved himself, and Mr. Sepulveda cleaned up after the puppy with a plastic bag.  Shortly thereafter, Mr. Sepulveda greeted a passerby with a handshake, while still holding the plastic bag.

16.      At that point, Ms. Vazquez heard a voice exclaim, "I just saw you," coming from across the street.  Ms. Vazquez turned and saw two police officers, who she later learned were Officers Obson Cesar and Alfredo Brewster, sitting inside a marked car.  Mr. Sepulveda and Ms.

4

Vazquez were confused by what the officers purportedly saw.  In any event, shortly thereafter, Officers Cesar and Brewster exited the police car and ran toward them.

17.     The officers immediately grabbed Mr. Sepulveda and threw him to the ground. As they did so, some of the money that Mr. Sepulveda planned to use for the puppy's vaccinations fell out of his pocket.  Ms. Vazquez reached down and picked up the money.

18.     Ms. Vazquez was shocked and frightened by the rapid escalation of the situation and feared that Mr. Sepulveda might be harmed by Officers Cesar and Brewster.  In light of those concerns, Ms. Vazquez began to film the incident with her new iPhone.

19.     Ms. Vazquez hoped the act of recording Officers Cesar and Brewster would help protect Mr. Sepulveda.  Ms. Vazquez also asked Officers Cesar and Brewster to leave Mr. Sepulveda alone and to stop harassing him.

20.     While Ms. Vazquez was filming Officers Cesar and Brewster, one of the two officers asked that Ms. Vazquez step away.  Ms. Vazquez complied, ensuring that she did not interfere with the arrest, while continuing to film the officers.

21.     Ms. Vazquez then called for help in an attempt to draw the presence of additional witnesses to the scene to discourage Officers Cesar and Brewster from harming Mr. Sepulveda.

22.     Eventually, additional NYPD officers arrived at the scene.  Officers Cesar and Brewster placed Mr. Sepulveda under arrest and escorted him to a police car.

23.     Throughout the time she was filming the officers, and during the entire duration of the encounter, Ms. Vazquez maintained a reasonable and safe distance from the officers.  She posed no threat to the officers and did not interfere with their actions.

24.     At no time was Ms. Vazquez ever questioned or detained by NYPD officers at the scene.  She was not placed under arrest, and there was no indication by Officers Cesar or Brewster, or any other NYPD officer, that Ms. Vazquez had acted unlawfully.

25.     Ms. Vazquez was free to leave the area and returned upstairs to her apartment to call Mr. Sepulveda's family and inform them of his arrest.

### Ms. Vazquez's Subsequent Interactions with NYPD Officers at PSA1

26.     After the arrest, Mr. Sepulveda was detained at Police Service Area 1 ("PSA1"), a police precinct at 2860 West 23rd Street in Brooklyn, New York, to which both Officers Cesar and Brewster were assigned.

27.     Ms. Vazquez tried to visit Mr. Sepulveda twice while he was detained at PSA1 on February 4, the day he was arrested.

28.     Her first visit was approximately two hours after Mr. Sepulveda was arrested. Officer Cesar met Ms. Vazquez at the entryway of PSA1.  Ms. Vazquez and Officer Cesar discussed what food Ms. Vazquez was allowed to drop off for Mr. Sepulveda.  She then left PSA1 without incident.

29.     On her second visit, Ms. Vazquez returned to PSA1 with a sandwich and a bottle of water for Mr. Sepulveda.  Officer Cesar again met Ms. Vazquez at the entryway, and Ms. Vazquez gave Officer Cesar the sandwich and water.  Officer Brewster was also present at PSA1 at this time.

30.     During the second visit, Ms. Vazquez briefly stepped outside of PSA1 to smoke a cigarette.  At the same time, Officer Brewster also stepped outside to smoke a cigarette.

31.     While they were both outside, Ms. Vazquez told Officer Brewster, in sum and substance, that she felt his and Officer Cesar's actions during Mr. Sepulveda's arrest were

uncalled-for, and that the officers' behavior was unprofessional.  Officer Brewster, in sum and substance, apologized to Ms. Vazquez for how the situation developed during the arrest.  During their conversation, Officer Brewster also told Ms. Vazquez to turn in the money that Mr. Sepulveda dropped during the arrest, which Officer Brewster said was considered evidence.  Ms. Vazquez told Officer Brewster that she had the money with her in her pocket and would of course provide it to him.

32.     Officer Brewster and Ms. Vazquez stepped back inside the precinct and approached the Desk Sergeant.  The Desk Sergeant requested that Officer Brewster turn his body camera off, which he did.  At that point, Ms. Vazquez gave the money that Mr. Sepulveda dropped during the arrest, which totaled about $100, to Officer Brewster.  Thereafter, again without incident, Ms. Vazquez left the precinct and returned home.

33.     At no point during these two visits to PSA1 did Officer Cesar, Officer Brewster, or any other NYPD officer detain Ms. Vazquez, place her under arrest, or suggest that she violated any law.

### *The NYPD's Retaliatory Arrest and Unlawful Detention of Ms. Vazquez*

34.     Two days later, on February 6, 2019, at approximately 4:30 a.m., Mr. Sepulveda was released from custody.

35.     A few hours after his release, Ms. Vazquez agreed to return to PSA1 with Mr. Sepulveda so he could collect his personal belongings, which had been taken from him at the time of his arrest.

36.     At or around 8:00 a.m., Mr. Sepulveda and Ms. Vazquez met in front of their son's school and walked over to PSA1.  When they entered the precinct, Officer Cesar and the Desk Sergeant seemed surprised to see Mr. Sepulveda and whispered to each other.  One of the

officers said to Mr. Sepulveda, in sum and substance, "You got out already?"  Mr. Sepulveda explained to them that he had returned to collect his property.

37.     Officer Cesar then approached Ms. Vazquez and said that he had some questions for her.  Ms. Vazquez told Officer Cesar that she did not wish to speak with him and was not obligated to answer questions.

38.     Officer Cesar placed Ms. Vazquez under arrest without probable cause or any explanation of her unlawful conduct.

39.     Ms. Vazquez was stunned and confused by her sudden arrest.  She had interacted with officers at PSA1 multiple times over a two–day period, and at no point did any officer suggest that she had done anything wrong.

40.     Throughout the arrest, Ms. Vazquez remained cooperative and respectful.

41.     Ms. Vazquez was frisked and searched by a female officer in full view of everyone in the lobby of PSA1, and her new iPhone—the one she used to record Officers Brewster and Cesar arresting Mr. Sepulveda—was seized by the police.

42.     After the invasive and humiliating search of her person, Ms. Vazquez was taken to PSA1's jail cells by Officer Cesar and a female officer.

43.     Officer Cesar chose to put Ms. Vazquez in jail cell "C," which Ms. Vazquez later learned was not monitored by video camera.

44.     The female officer searched Ms. Vazquez for a second time.  She frisked Ms. Vazquez, lifted her shirt to show her bra, and had her remove the strings of her jacket and shoelaces.

45.     NYPD officers failed to allow Ms. Vazquez access to a phone for almost two hours.  Once she was finally permitted to make a phone call, Ms. Vazquez called her mother,

who was caring for her son.  Ms. Vazquez's mother told her that her son was sick and running a fever.  After being told that upsetting news, Ms. Vazquez became distressed and anxious and began to cry because she was not able to care for her sick child.

46.      The stress from her detention also triggered an asthma attack.  While she was in custody, Ms. Vazquez felt her breathing constrict several times, and deep breaths caused her to feel as if she was choking.  Throughout much of the day, Ms. Vazquez was restricted to taking small, short breaths to prevent an asthma-induced coughing fit.

47.      To make matters worse, Ms. Vazquez did not have her inhaler with her when she was arrested.  Ms. Vazquez alerted Officer Cesar that she was having difficulty breathing and needed her medication.  Officer Cesar told Ms. Vazquez, in sum and substance, that people cannot bring medication into jail without the proper paperwork, and he would need to ask his captain.  Later on, Ms. Vazquez's mother brought her inhaler to PSA1, but at no point was Ms. Vazquez ever granted access to the inhaler.  Instead, she was left to struggle with her breathing while her medication sat with the officers.

48.      Ms. Vazquez remained at PSA1, in the custody of the NYPD, for more than eight hours.

49.      During that time, Ms. Vazquez was forced to sit in a cell all day as Officer Cesar lingered outside, sitting across from her, inappropriately flirting with her, making suggestive comments about her appearance, and asking her probing, personal questions.  For example, at one point, when Officer Cesar was looking at her identification picture, Officer Cesar told her "You look like you like to have fun."  Officer Cesar also asked Ms. Vazquez if she exercised. Ms. Vazquez felt sexually harassed by Officer Cesar's conduct.

50.     When Ms. Vazquez needed to use the restroom, Officer Cesar unlocked her cell and took her himself, rather than having a female officer escort her.  There was a window in the restroom door that Officer Cesar could look through while Ms. Vazquez was inside, which made Ms. Vazquez uncomfortable.

51.     Officer Cesar also belittled Ms. Vazquez for being involved in anti-violence initiatives in her community.

52.     During Ms. Vazquez's detention in the unmonitored cell, where Officer Cesar lingered, another officer appeared and asked Officer Cesar to move Ms. Vazquez to a cell that was under video surveillance.  Realizing that there was no record of her time in the cell, or of Officer Cesar's actions, up to this point, Ms. Vazquez became afraid—concerned that Officer Cesar had specifically chosen to place her in a cell without camera coverage.

53.     At or around 5:30 p.m., Ms. Vazquez was placed in a van and transported to the New York Police Department's Central Booking Office by NYPD officers, including Officer Jane Doe.  Her arrest number was #K19607017.

54.     Prior to being moved to the van, Ms. Vazquez was handcuffed by Officer Jane Doe.  The handcuffs were too tight and cut off her circulation and she began to experience pain, numbness, and spasms in her hands.

55.     While waiting in the van in the parking lot of PSA1, Ms. Vazquez pleaded multiple times with the officers to loosen the cuffs a bit.  Officer Jane Doe responded "they're not supposed to be comfortable."  The officers otherwise ignored Ms. Vazquez's pleas.  Ms. Vazquez felt "pins and needles" running up her arms due to the tightness of the handcuffs.

56.     The stress and pain of Ms. Vazquez's situation triggered another asthma attack, which was exacerbated by the cold February air.  Ms. Vazquez remained unable to access her

inhaler, even though Officer Cesar had given it to the officers in charge of transporting her to the Central Booking Office.  Indeed, Ms. Vazquez was not given access to her inhaler until she was finally processed at the Central Booking Office, more than an hour from when she was first handcuffed and many, many hours from when the officers at PSA1 first received her inhaler. Throughout her transport to the Central Booking Office, and her processing, the officers left Ms. Vazquez handcuffed with limited circulation, in pain, and with labored breathing.

57.     NYPD records indicate the charge leading to Ms. Vazquez's arrest was for allegedly obstructing governmental administration pursuant to New York Penal Law § 195.05, based on her supposed interference in the arrest of Mr. Sepulveda days earlier.  Officer Brewster prepared the complaint against Ms. Vazquez, alleging that Ms. Vazquez "distracted" Officers Cesar and Brewster during Mr. Sepulveda's arrest by being too close with her leashed dog, and "intentionally creating" a dangerous situation.  Officer Cesar entered the arrest report.

58.     It is clear from the circumstances that the stated reason for Ms. Vazquez's arrest was entirely pretextual.  As noted herein, at no time during Mr. Sepulveda's arrest—or during Ms. Vazquez's two subsequent visits to PSA1 later that same day—did Officers Cesar or Brewster ever state that Ms. Vazquez was in any way improperly "distracting" them or that her actions had in any way "intentionally created" a dangerous situation.  To the contrary, when they asked her to provide additional space during Mr. Sepulveda's arrest, Ms. Vazquez complied immediately.  Upon information and belief, the actual reason for Ms. Vazquez's arrest was in retaliation for filming Officers Cesar and Brewster during Mr. Sepulveda's arrest on February 4.

59.     The Brooklyn District Attorney's Office apparently agreed that there was no basis to charge Ms. Vazquez with any crime.  At about 9:00 p.m., after more than 13 hours in NYPD

custody, Ms. Vazquez was finally released when the District Attorney's Office declined to prosecute her.

60.    In the days following her release, Ms. Vazquez experienced intermittent numbness in her hands, as well as bruises and scrapes around her wrists.  To this day, she continues to suffer from discomfort in her wrists caused by the tight handcuffs, as well as weakness in her grip strength.  Indeed, she cannot engage in basic functions using her hands, such as writing or typing on her phone, without experiencing pain in her wrists and inflammation after a short period of time.

61.    About a week after her arrest, Ms. Vazquez attempted to collect her iPhone from PSA1.  Returning to PSA1 caused Ms. Vazquez to suffer a panic attack; her breathing felt tight and she felt like the walls of the precinct were closing in on her.  Ms. Vazquez's co-worker, who accompanied Ms. Vazquez on the visit, had to speak to the desk clerk on her behalf.  The desk clerk told them that Ms. Vazquez's iPhone was not at PSA1, and she would need to go "downtown" to retrieve it.  But a week later, when Ms. Vazquez went to the address provided by the desk clerk, she was told by the City employees there that she was in the wrong location and was directed to a different address.  When she arrived at the second location, she was told by City employees that they did not have any information regarding her iPhone.  Ms. Vazquez attempted to retrieve her iPhone on at least one additional occasion and was again given the runaround, after which she gave up on attempting to retrieve her phone.  It was not until August 2021, with assistance from her counsel, that Ms. Vazquez was finally able to recover the phone.

62.    In connection with her arrest, Ms. Vazquez submitted a complaint with the CCRB—New York City's "police watchdog" organization.  The CCRB substantiated two of Ms.

Vazquez's allegations related to abuse of authority by NYPD officers, including an allegation against Officer Brewster.

### *The Devastating Impact of the Unlawful and Retaliatory Arrest by NYPD Officers of Ms. Vazquez*

63.     The NYPD's retaliatory arrest of Ms. Vazquez devastated her emotionally, jeopardized her livelihood and humiliated her both personally and professionally.

64.     In her role at Operation H.O.O.D., Ms. Vazquez oversaw programming and community outreach for surrounding schools.  Ms. Vazquez's position required, and she received, clearance from the Department of Education ("DOE").  But after the NYPD's retaliatory and wrongful arrest of Ms. Vazquez, the DOE immediately suspended her DOE clearance.  Before she could resume working inside any school, she was required to provide proof of declined prosecution, which she was only able to obtain on or around March 8, 2019— more than a month after her arrest.  During that time, she was unable to go into any schools and was forced to avoid scheduling school events.  To Ms. Vazquez's recollection, she had to use her accrued vacation time during this period to ensure she would still receive a paycheck.

65.     Ms. Vazquez's role at Operation H.O.O.D. also required her to work closely with both her neighbors and local police commands, including PSA1.  But due to the stigma and shame of her arrest, and given her fear of seeing Officers Brewster or Cesar again, it took months—until April 2019—before Ms. Vazquez felt comfortable enough to attend any meetings at PSA1, or in any other locations where she believed representatives of PSA1 might be present. Even then, given her continuing fear and discomfort, Ms. Vazquez attended fewer meetings at PSA1 than she had in the past.  Moreover, for several months after her arrest, Ms. Vazquez was too ashamed and embarrassed even to go into her office, and instead worked from home during that time.

13

66.     Following the NYPD's unlawful arrest of Ms. Vazquez, rumors circulated in her neighborhood that the police had raided her apartment or kicked down her door.  These rumors reached her employer at Operation H.O.O.D. and harmed her professional reputation.  For example, co-workers were chosen to attend certain community events in Ms. Vazquez's place, because Ms. Vazquez was seen as having a tarnished reputation.

67.     Ms. Vazquez's impaired reputation also made it difficult for her to schedule meetings with community leaders (such as the president of her housing complex)—an important component of her role as a community worker—as community leaders did not want to be associated with her.

68.     The NYPD also attempted to malign Ms. Vazquez's professional reputation directly by informing her boss at Operation H.O.O.D., Derek Scott, about her arrest, and inviting him to view officers' body camera footage.  Notably, such an invitation was in stark contrast to Ms. Vazquez's own lawful requests for the body camera footage, which she made through multiple FOIL requests and which were denied without any reason.

69.     Since her role at Operation H.O.O.D. required her to work closely with and maintain a good reputation among her neighbors and the local police commands, the loss of reputation resulting from her unlawful arrest and the NYPD's other actions described herein had major repercussions for Ms. Vazquez's standing with her employer.

70.     The NYPD's retaliatory and unlawful arrest also had negative consequences for Ms. Vazquez's personal life.

71.     Prior to the NYPD's unlawful and wrongful arrest, Ms. Vazquez was a Dean's List student in the University of Phoenix's online business studies program.  However, the trauma, stress, and embarrassment Ms. Vazquez experienced as a result of her arrest caused her

to miss several assignments and caused her grades to decline.  In addition, the arrest itself caused Ms. Vazquez to miss a class on February 6, which put her in danger of being dropped from her class roster and caused her additional stress.

72.     Officers Cesar and Brewster regularly patrolled Ms. Vazquez's neighborhood and building.  After her arrest, Ms. Vazquez frequently observed Officer Cesar parked across the street from her Brooklyn apartment building.  The sight of him made her experience panic attacks; she worried that Officer Cesar knew where she lived, since, as a PSA1 officer, his patrol was within her New York City Housing Authority building and, in her neighborhood.

73.     Moreover, terrified to encounter Officers Cesar and Brewster in her neighborhood or in her building after her arrest, Ms. Vazquez uprooted herself and her son from the apartment where she had lived for more than 20 years to stay at her mother's home in Harlem.  She eventually relocated back to her apartment in Brooklyn for a time, because the commute from Harlem to her son's school in Brooklyn was becoming emotionally taxing on her family as well as financially draining.  Recently, however, Ms. Vazquez made the decision to permanently escape the influence of Officers Cesar and Brewster, and PSA1.  She and her son relocated out of New York City, moving to upstate New York.

74.     Despite the move, Ms. Vazquez remains unable to fully escape the trauma of her unlawful arrest.  Among other things, she fears that her son will learn about her arrest, and that this knowledge could affect his perception of her.

75.     A clinical psychologist, Dr. Chitra Raghavan, PhD, has met with Ms. Vazquez several times to evaluate her for psychological and/or emotional trauma stemming from her wrongful arrest.

76.     As of the date of this filing, Dr. Raghavan's professional opinion, to a reasonable degree of psychological certainty, is that Ms. Vasquez has suffered extensive emotional and social distress as a result of her wrongful arrest.

77.     According to Dr. Raghavan, as a result of Ms. Vazquez's experience—especially during the arrest itself and the ensuing hours before being transported to Central Booking—Ms. Vasquez experienced significant clinical distress, including a severe episode of Posttraumatic Stress Disorder and a myriad of other clinical symptoms.

78.     In Dr. Raghavan's professional opinion, Ms. Vasquez's distress is pervasive and has disrupted her parenting, social networks and family relationships, intimate relationships, work and career, her sense of safety and trust in American institutions, and her racial and ethnic identity as a Black/Puerto Rican woman.  Dr. Raghavan believes that it will take years for Ms. Vasquez to return to an equivalent of her previous level of functioning that she enjoyed prior to her wrongful arrest.

### *The City is Liable for the NYPD's Retaliatory and Unlawful Arrest and Detention of Ms. Vazquez*

79.     It is the policy, custom, and practice of the City of New York and the NYPD to permit officers to obstruct, retaliate against, arrest, and threaten to arrest members of the public who exercise their First Amendment right to film police officers engaged in their official duties in public places, even when those individuals are not interfering in any way with the police activity at issue.  This custom is fostered by the City's and the NYPD's deliberate indifference.

80.     The City of New York and the NYPD fail to adequately train, supervise, and discipline police officers who interfere with the First Amendment right to record police activity. In addition, the City of New York and the NYPD fail to adequately and properly investigate citizen complaints of police misconduct.

*The City and NYPD Have a Custom and Practice of Violating the*
*First Amendment Rights of Persons Recording Police Officers*

81.     The retaliatory arrest of Ms. Vazquez is but one example in a seemingly never-ending cycle of unlawful arrests by the NYPD in retaliation against individuals exercising their First Amendment right to record the police.  Given the sheer volume of legal actions brought against the City and the NYPD in recent years for this type of constitutional violation (a substantial number of which the City has settled), the City has constructive knowledge of the NYPD's custom and practice of routinely violating citizens' First Amendment rights in that regard.

82.     Described below and in the attached Appendix A[3] are a litany of examples demonstrating the City and the NYPD's long-standing custom and practice of violating citizens' Constitutional right to record the police:

(a)     According to a case filed in the Southern District of New York, on February 9, 2005, three community organizers (Messrs. Bandele, Toure and Floyd), who were trained to lawfully record police activity, were arrested by NYPD officers for videotaping the arrest of two individuals in Bedford-Stuyvesant, Brooklyn.  While recording the arrest, the community organizers stood on a public sidewalk and at all times remained at a lawful distance from the arresting officers.  After the arrestees were secured, NYPD officer Thomas Stevens approached the community organizers and ordered them to leave the area, though they continued to videotape the police.  In retaliation, Officer Stevens pushed two of the individuals, knocking their video camera and one of the individuals to the ground, and breaking the camera.  Officer Stevens and

_____

[3] Appendix A contains an additional 19 cases illustrating this long-standing custom and practice of violating citizens' First Amendment rights.

two other NYPD officers proceeded to arrest all three individuals.  The two unnamed officers struck each man as they were placed into custody.  The individuals, who did not resist arrest, were initially charged with resisting arrest, disorderly conduct, and obstruction of governmental administration.  One of the individuals was also charged with assault in the third degree.  The individuals were held in jail for approximately 24 hours.  The Kings County District Attorney eventually dismissed all charges with prejudice.  The individuals subsequently sued the City for violating their civil rights.  The City settled the matter.[4]

(b)      According to a lawsuit filed in the Eastern District of New York, on June 5, 2012, Hadiyah Charles was arrested for using her smartphone to record NYPD officers Pamela Benites and Raymond Williams as they questioned and frisked three men.  Before her arrest, Ms. Charles had approached the officers to ask what was happening and was told that it was "police business."  She was then asked to step away from the scene, which she did, before beginning to record the incident with her smartphone.  Even though she was already a reasonable distance away and was not interfering with the officers' actions, Officer Benites tried to stop Ms. Charles from recording by repeatedly asking her to step further away.  Officer Benites also shoved Ms. Charles when she told a supervising officer that she wished to file a formal complaint.  Ms. Charles was then handcuffed, placed in a police van, and later charged with disorderly conduct.  She subsequently filed a lawsuit, which included a claim for violation of her First Amendment rights, which the City ultimately settled.[5]

---

[4] *Bandele v. City of New York*, No. 07-cv-03339 (S.D.N.Y. filed Apr. 26, 2007).
[5] *Charles v. City of New York*, No. 12-cv-06180 (E.D.N.Y. filed Dec. 17, 2012).

(c)      According to a lawsuit filed in the Eastern District of New York,

Fitzgerald Brown was arrested on June 6, 2012, after recording NYPD officers making an

arrest in Brooklyn.  Shortly after Mr. Brown recorded the arrest, two of the arresting

officers pulled up to his home, grabbed him, pushed him against a vehicle, and

handcuffed him.  He was then taken to the 75th Precinct, where he was held until his

arraignment the following day, though all charges against him were ultimately dismissed.

Mr. Brown sued the City for violating his civil rights; the City settled.[6]

(d)      According to a lawsuit filed in the Eastern District of New York, on

January 4, 2013, an NYPD officer arrested Shawn Thomas for filming another arrest in

Brooklyn.  Officer Mohammed Karimzada approached Mr. Thomas, asked for his

identification, grabbed his phone, and placed him under arrest.  Mr. Thomas was charged

with obstructing governmental administration, disorderly conduct, and criminal

possession of a weapon.  All of the charges were later dismissed.  Several months later,

on June 15, 2013, Mr. Thomas was again arrested—this time by two different NYPD

officers—after filming police activity outside of a Brooklyn police precinct.  Mr. Thomas

was again charged with disorderly conduct—a charge that was likewise later dismissed.

Mr. Thomas subsequently filed suit, and the City settled.[7]

(e)      According to a lawsuit filed in the Eastern District of New York, on June

5, 2013, Rahul Saksena was arrested by NYPD officers for videotaping approximately 14

NYPD officers questioning a man in Brooklyn.  While Mr. Saksena was videotaping the

interaction, one of the officers told him to step back.  He complied, but he did not stop

filming.  One officer then grabbed his arm and slammed him into a nearby fence.  Mr.

---

[6] *Brown v. City of New York,* No. 13-cv-04946 (E.D.N.Y. filed Sep. 4, 2013).
[7] *Thomas v. City of New York*, No. 15-cv-02594 (E.D.N.Y. filed May 6, 2015).

Saksena suffered pain and bruising.  He was handcuffed and transported to a precinct, where he was issued a summons for disorderly conduct, which was later dismissed.  Mr. Saksena sued the City, and the lawsuit settled.[8]

(f)     According to a lawsuit filed in the Southern District of New York on June 24, 2013, Tiesheia Young was arrested after attempting to film an interaction involving NYPD officers and her boyfriend.  Ms. Young was asked for her identification by NYPD Officer Thomas Adams, and she complied with the request.  Officer Adams then walked toward her home and, fearing that he would enter her home without permission, Ms. Young took out her cell phone and began filming him—standing at a distance to ensure that she did not interfere with the performance of his duties.  Officer Adams demanded that she give him her phone, which she refused to do.  He then arrested Ms. Young, placed her in handcuffs, and transported her to the 44th precinct.  Ms. Young was charged with obstruction of governmental administration.  Ms. Young lost her job as a result of the arrest and the charges against her.  After fighting the charges in court for three years, all of the charges were eventually dismissed.  Ms. Young sued the City for violating her civil rights during this incident.  The City settled the matter.[9]

(g)     According to a lawsuit filed in the Southern District of New York, on September 25, 2013, NYPD officers, including Officer Steven Rodriguez, arrested Debra Goodman for filming their interaction with a citizen requiring medical attention.  As Ms. Goodman filmed, an officer began recording her with his cell phone.  The officer then confronted Ms. Goodman and demanded that she produce identification.  When she refused to do so, she was placed under arrest.  The New York County District Attorney's

---

[8] *Saksena v City of New York*, No. 14-cv-05129 (E.D.N.Y. filed Aug. 29, 2014).
[9] *Young v. City of New York*, No. 16-cv-01695 (S.D.N.Y. filed Mar. 5, 2016).

Office ultimately dismissed all charges against Ms. Goodman.  She later brought suit, and the City settled the matter.[10]

     (h)     According to a lawsuit filed in the Southern District of New York, on September 28, 2013, Santos Bobet was arrested by NYPD Officers Prado, Mendez, and Rodriguez for recording the officers handcuffing another individual.  When Mr. Bobet began videotaping the incident, which occurred by a subway station, Officer Mendez told Mr. Bobet that he needed to pay his fare or stop videotaping the encounter.  Mr. Bobet paid the fare and continued recording.  Officer Mendez then grabbed the video camera from Mr. Bobet and handcuffed him.  The footage from the camera was deleted.  Mr. Bobet was charged with obstructing governmental administration, but the charge was later dismissed.  Mr. Bobet subsequently sued the City for violating his civil rights, and the City settled the case. [11]

     (i)     According to a lawsuit filed in the Eastern District of New York, on October 11, 2013, NYPD officers arrested Bina Ahmad, a criminal defense attorney, for photographing the arrest of another individual in Kings County.  As she began to leave, Ms. Ahmad was handcuffed and placed under arrest by NYPD officers, including Officers Sikora and Napolitano.  The charges against Ms. Ahmad were later dismissed.  Ms. Ahmad sued the City for violating her rights during this incident.  The City settled the case.[12]

     (j)     According to a lawsuit filed in the Southern District of New York, Alexandria Reel was arrested on December 27, 2013 in the Bronx when she recorded

---

[10] *Goodman v. City of New York,* No. 14-cv-05261 (S.D.N.Y. filed July 15, 2014).

[11] *Bobet v. City of New York*, No. 14-cv-01396 (S.D.N.Y. filed Mar. 3, 2014).

[12] *Ahmad v. City of New York*, No. 15-cv-07157 (E.D.N.Y. filed Dec. 16, 2015).

NYPD officers, as they pulled over a car in which she was a passenger.  One of the officers smacked the phone out of Ms. Reel's hand and told her that she was not allowed to record them.  The officers then arrested both the driver and Ms. Reel.  Ms. Reel was charged with resisting arrest, obstruction of governmental administration, and harassment.  The charges were later dismissed.  Ms. Reel sued the City for violating her civil rights during this incident.  The City settled the case.[13]

(k)     According to a lawsuit filed in the Southern District of New York, on April 2, 2014, Wajid Kahlil Al-Qadaffi was arrested by NYPD officers Colon and Thomas in retaliation for filming the officers as they confronted and seized two young men on a public sidewalk in the Bronx.  Two officers asked Mr. Al-Qadaffi to stop filming, and he complied.  The officers then searched him and told him that he would be arrested if he tried to leave the area.  Officer Thomas grabbed Mr. Al-Qadaffi's cell phone.  The officers unsuccessfully tried to coerce employees of a nearby restaurant into saying that Mr. Al-Qadaffi had refused their request to leave the area.  One of the officers then told him to leave the area and threatened to arrest him, send him to Riker's Island, and confiscate his possessions if he did not do so.  Mr. Al-Qadaffi complied with the request.  He later sued the City for violating his civil rights.  The City settled the case.[14]

(l)     According to a lawsuit filed in the Eastern District of New York, on June 1, 2014, NYPD officers arrested Renee Cole for filming the arrest of her boyfriend in Brooklyn.  Officer Robert Deck approached Ms. Cole while she was filming, pushed her to the ground, confiscated her cell phone, and placed her under arrest.  Officers subsequently deleted her recording of the incident.  Ms. Cole was detained for

---

[13] *Reel v. City of New York*, No. 16-cv-07248 (S.D.N.Y. filed Sep. 16, 2016).
[14] *Al-Qadaffi v. City of New York*, No. 15-cv-00052 (S.D.N.Y. filed Jan. 6, 2015).

approximately 14 hours.  She was charged with assaulting a police officer, obstructing governmental administration, harassment, and resisting arrest.  The charges were later dismissed.  Ms. Cole sued the City for violating her rights.  The City settled the case.[15]

(m)     According to a lawsuit filed in the Eastern District of New York, on July 16, 2014, NYPD officers arrested Ramsey Baines for filming the officers' interaction with a citizen who was apprehended and arrested on the street in Brooklyn.  As Mr. Baines began to walk away to make a phone call, one of the officers threw him to the ground.  Subsequently, officers, including Officer Jonathan Thomas, placed Mr. Baines under arrest.  Ultimately all charges were dismissed.  The City settled a civil lawsuit filed by Mr. Baines.[16]

(n)     According to a lawsuit filed in the Southern District of New York, on September 5, 2014, Deyan Fang was working as a street vendor selling drawings when NYPD officers approached him and asked for identification.  Mr. Fang complied and started recording the incident.  The NYPD officers arrested him and charged him with resisting arrest and a statutory violation for vending within 10 feet of a crosswalk.  The charges were adjourned in contemplation of dismissal.  The District Attorney's Office held Mr. Fang's phone for two months and deleted the video of the incident before it was returned.  Mr. Fang subsequently filed suit, and the City settled the case.[17]

(o)     According to a lawsuit filed in the Southern District of New York, on February 21, 2015, Michael Younes was arrested after filming NYPD officers arresting his friends.  Mr. Younes did not interfere with his friends' arrest, but NYPD officers

---

[15] *Cole v. City of New York*, No. 15-cv-04690 (E.D.N.Y. filed Aug. 11, 2015).

[16] *Baines v. City of New York,* No. 15-cv-01472 (E.D.N.Y. filed Mar. 20, 2015*).*

[17] *Fang v. City of New York*, No. 15-cv-04886 (S.D.N.Y. filed June 23, 2015).

Stanley Lopez, Gregory Fink, and Frank Kurys seized, handcuffed, and arrested Mr.

Younes.  The officers accused him of unlawfully interfering with their duties, took him to

the 9th Precinct, seized his personal property, and held him for five hours before taking

him to central booking.  Mr. Younes was charged with obstructing governmental

administration in the second degree, criminal possession of a controlled substance in the

seventh degree, and harassment in the second degree.  All charges against him were later

dismissed.  Mr. Younes filed a lawsuit against the City for alleged violations of his civil

rights, which the City settled.[18]

      (p)     According to a lawsuit filed in the Eastern District of New York, on May

15, 2015, NYPD officers threatened to arrest several individuals for attempting to film

officers' violent interactions with their family member (Justin Martinez) and another

individual (Jennie Perez Vierra).  The family members attempted to film NYPD officers

pinning Ms. Vierra (who had recently had two cardiac stents implanted) between a wall

and a door for several minutes as they were punching Mr. Martinez in the face and body.

The officers threatened the family members, which prevented them from recording the

incidents.  The City later settled a civil case brought by the individuals.[19]

      (q)     According to a lawsuit filed in the Eastern District of New York, on May

27, 2015, a son (Mauricio Gold) was arrested after recording the earlier arrest of his

father by NYPD officers at Citi Field during a Mets game.  NYPD officers had asked the

father and son to leave the game, even though they had done nothing illegal nor

conducted themselves in such a manner as to warrant being removed.  After the father

refused to hand the officers his tickets, an officer twisted his arm, pushed him against a

---

[18] *Younes v. New York*, No. 16-cv-01030 (S.D.N.Y. filed Feb. 10, 2016).
[19] *Martinez v. City of New York*, No. 16-cv-02460 (E.D.N.Y. filed May 13, 2016).

wall, and handcuffed him.  The son, who was standing 15 feet away from his father, took out his cell phone and began to record the interaction.  One of the officers smacked the cell phone out of his hands, breaking it.  The son was then handcuffed himself.  Both men were charged with trespassing, though the charges were later dismissed.  The City later settled the civil case.[20]

(r)     According to a lawsuit filed in the Eastern District of New York, on July 30, 2015, Tyrone Buie was arrested after recording his friend's stop, search, and arrest by NYPD officers in Brooklyn.  After Mr. Buie started filming, NYPD Officer Vincent Lindner approached him, threw him to the ground, and placed him in handcuffs.  Officers Lindner, William Dugan, and Miguel Figeroa informed the King's County District Attorney's Office that they had observed Mr. Buie committing criminal trespass in the third degree.  Mr. Buie spent over a day in custody after his arrest.  All charges against him were eventually dismissed.  Mr. Buie sued the City for violating his civil rights during this incident, and the City settled.[21]

(s)     According to a lawsuit filed in the Eastern District of New York, on September 2, 2015, Ronda Peters was arrested by NYPD officers in Brooklyn, on her way home from band practice, for filming police as they were throwing a group of young men against a wall.  As Ms. Peters was recording the incident, officers approached her and asked her for identification.  She identified herself but told the officers that she could not provide identification because she had lost her wallet.  The officers placed her in handcuffs, searched her, and confiscated her phone.  She was arrested and falsely charged with unlawful possession of marijuana, consumption of alcohol in public, and false

---

[20] *Gold v. Ha,* No. 16-cv-03862 (E.D.N.Y. filed July 12, 2016).
[21] *Buie v. City of New York*, No. 16-cv-00960 (E.D.N.Y. filed Feb. 25, 2016).

personation.  She was kept in police custody for 24 hours.  Ms. Peters sued the City for violating her civil rights during this incident, and the City settled.[22]

(t)        According to a lawsuit filed in the Eastern District of New York, Oquan Hardy was working at a tire repair shop on October 21, 2015 in Brooklyn when an individual ran inside his shop, followed by NYPD officers.  Mr. Hardy started to record the incident.  The officers asked Mr. Hardy to move away, which he did.  The officers then interrogated him about the shop, handcuffed him, and brought him to the 73rd Precinct.  Mr. Hardy was charged with obstruction of governmental administration, which the District Attorney's Office declined to prosecute.  He sued the City for violating his civil rights during this incident, and the City settled.[23]

(u)        According to a suit filed in the Southern District of New York, on July 8, 2017, Briia Jenkins observed police officers accosting three young African American men and throwing them to the ground.  While Ms. Jenkins was recording the incident on her cell phone, one of the young men took flight.  Ms. Jenkins then stopped recording and left the scene, but soon after, she was assaulted by several police officers, who hit, punched, and struck her, shattering her cell phone screen.  She was then arrested and held in custody for several hours, before being released with two summonses—both of which were later dismissed.  Ms. Jenkins subsequently brought suit against the City, and obtained a judgment in her favor.[24]

83.        Nor has this pattern and practice of unlawful retaliation abated in more recent years.  To the contrary, during recent protests in New York City and during other recent

_____

[22] *Peters v. Rolfottl*, No. 16-cv-01943 (E.D.N.Y. filed Mar. 20, 2016).
[23] *Hardy v. City of New York*, No. 16-cv-05804 (E.D.N.Y. filed Oct. 18, 2016).
[24] *Jenkins v. City of New York*, No. 18-cv-9177 (S.D.N.Y. Dec. 16, 2019).

incidents, NYPD officers repeatedly arrested (and often assaulted) people based on meritless charges that were ultimately dismissed, simply because those individuals were lawfully exercising their constitutional right to record the police.  Each of these incidents has resulted in additional litigation against the City, all of which remains pending.  For example:

(a)     On May 30, 2020, Rayne Valentine observed six NYPD officers pursuing and then using force against another man during protests in New York City.  As Mr. Valentine was recording the incident with his cell phone, he was approached by a police officer who screamed at him to "get back."  Although Mr. Valentine complied with the request, the officer pushed him to the ground and repeatedly struck and kicked him. Other NYPD officers also assaulted him.  Mr. Valentine was later admitted to the hospital where he received staples to close a head wound.  His case against the City is ongoing.[25]

(b)     According to a suit filed in the Southern District of New York, on the evening of June 2, 2020, Zuleyka Morales observed police in riot gear using significant force against protestors and bystanders.  Ms. Morales took out her cell phone to record the incident.  As soon as she began to do so, she was attacked from behind and thrown to the ground by an NYPD sergeant.  She tried to tell the sergeant that she was an essential worker, but he and at least two other NYPD officers began to strike her head against the sidewalk and street.  The officers also obstructed her breathing by kneeling on her back and neck while applying zip ties to her wrists.  She was never told why she was being arrested, and she lost consciousness during the incident.  She was later sent to a hospital where she was diagnosed with a hematoma of the head and bruising.  After her hospital

---

[25] *People v. City of New York*, No. 21-cv-00322 at ¶¶ 312–17 (S.D.N.Y. filed Mar. 24, 2021) (consolidated matter referred to as *In Re: New York City Policing During Summer 2020 Demonstrations*, No. 20-cv-08924 (S.D.N.Y. filed Oct. 26, 2020)).

visit, she was returned to police custody, before being released the next morning with a criminal summons for violating City curfew.  Her case against the City is ongoing.[26]

(c)      According to a lawsuit filed in the Southern District of New York, on November 4, 2020, Alexandra Crousillat was yanked by her backpack and slammed to the ground by an NYPD officer as she was recording NYPD officers arresting protestors. Ms. Crousillat was zip-tied extremely tightly, which caused her to experience tingling in her right arm for several weeks following her arrest.  She also was assaulted by the officers, causing injury.  Her case against the City is still pending.[27]

(d)      According to a lawsuit filed in the Southern District of New York, on May 31, 2020, Vivian Matthew King-Yarde was filming protesters from his bicycle as a member of the press.  An NYPD officer told Mr. King-Yarde to back up, but before he could do so, the officer shoved him.  Mr. King-Yarde told the officer that he was a member of the press, but the officer shoved him again and knocked him to the ground, causing his phone to fall and break.  Mr. King-Yarde was then pinned down and restrained.  He suffered injuries due to his rough treatment by the police during the arrest, including shoulder pain and a stomach wound.  He was also placed in a tightly packed and COVID-unsafe holding cell where he was held for several hours and then released. He was not charged with any crime.  His case against the City is ongoing.[28]

(e)      On June 4, 2020, Nicholas Mulder was arrested after filming NYPD officers assaulting protestors with batons.  He was filming from a safe distance when an NYPD officer shoved him against a police car and tackled him from behind.  The officer

---

[26] *Id.* at ¶¶ 318–23.
[27] *Id.* at ¶ 392.
[28] *Id.* at ¶¶ 90–94.

landed on his knee.  While Mr. Mulder was immobilized on the ground, he attempted to tell the officer that he was a member of the press, but was struck in the head with a baton. He was then arrested for violating the Mayor's curfew and detained for several hours (without being offered medical attention) before being released.  His summons was later dismissed.  The case is still pending.[29]

(f)      According to a lawsuit filed in the Eastern District of New York, on May 29, 2020, Joan Fraser was struck with a baton by an NYPD officer and knocked to the ground while she was in the process of filming a protest.  Her case against the City is pending.[30]

(g)      According to a lawsuit filed in the Southern District of New York, on June 2, 2020, Kiyee Kye and Jessica Kiyee filmed the police chasing a young African American man.  Mr. Kye and Ms. Kiyee were recording the police from a safe distance when they were confronted by a group of officers.  Mr. Kye handed his cell phone to Ms. Kiyee, who began to record.  Mr. Kye was then surrounded and beaten by the police officers, despite having his hands above his head and complying with officers.  Ms. Kiyee was then surrounded by police as well.  She told the officers that she was an essential worker simply escorting her cousin, Mr. Kye, to the subway.  During her questioning, an officer who had just arrived on the scene rushed at her and insisted that she be placed under arrest.  Mr. Kye was then forcibly placed against a wall and handcuffed.  Mr. Kye and Ms. Kiyee's lawsuit against the City is ongoing.[31]

---

[29] *Id.* at ¶¶ 156–61.
[30] *Fraser v. City of New York*, No. 20-cv-05741 (E.D.N.Y. filed Nov. 25, 2020).
[31] *Kye v. City of New York*, No. 21-cv-03660 (S.D.N.Y. filed Apr. 26, 2021).

(h)     On October 26, 2020, the New York State Attorney General filed suit against the City, seeking injunctive and declaratory relief based on the NYPD's pervasive use of excessive force and false arrests against New Yorkers during the protests in May and June of 2020.  The complaint describes a pattern of intimidation, assault, harassment and false arrests in response to individuals exercising their First Amendment right to record police activity, and notes that attacks on individuals were directed by NYPD supervising officers.[32]

(i)     Likewise, members of the press filed suit last year, also seeking injunctive and declaratory relief in connection with the same misconduct—detailing numerous arrests, assaults, and harassment by NYPD officers of journalists filming or photographing police activity during the 2020 protests.[33]

84.     The above-described examples reflect a custom and practice by NYPD officers of violating the First Amendment rights of people recording or attempting to record police activity, and provides prima facie evidence of the City's and the NYPD's constructive knowledge thereof. Indeed, upon information and belief, the cited examples represent only a small fraction of the actual incidents in which the NYPD has improperly prevented citizens from lawfully recording police activity or retaliated against individuals who do so.

### *In Addition, or in the Alternative, This Custom of Violating the Rights of Persons Recording Police Officers Is Perpetuated by the City's Deliberate Indifference*

85.     The City and the NYPD has knowledge of the custom and practice of NYPD officers violating the rights of persons recording police officers, as described herein, yet remains deliberately indifferent to continued violations of citizens' rights by turning a blind eye to

---

[32] *In re: New York City Policing During Summer 2020 Demonstrations*, 20-cv-08924 (S.D.N.Y. filed Oct. 26, 2020)
[33] *Gray v. City of New York*, No. 21-cv-06610. (S.D.N.Y. filed Aug. 5, 2021).

repeated violations of that right and deliberately failing to take any meaningful action to rectify this longstanding and unabating issue.

86.     In 2017, the CCRB published a report examining NYPD officers' interference with individuals recording police activity.  From January 1, 2014 through December 31, 2016, the CCRB "closed 257 complaints in which civilians reported that officers had interfered with their ability to record police activity," which "included 346 allegations that directly addressed alleged officer interference with civilian recordings of police activity.[34]   Notably, the report concluded that the data supported "that officer interference with civilian recordings of police conduct is an issue in New York City."[35]

87.     Moreover, from 2006 to 2019, there were 11 civilian complaints made to the CCRB against Officer Brewster alone, including one that was substantiated in part, which was the complaint by Ms. Vazquez in connection with the events described herein.  During the period from 2014 to 2019, there were an additional three civilian complaints made to the CCRB against Officer Cesar, two of which involved allegations of excessive physical force.

88.     These, along with the numerous examples of police misconduct that took place in the last few years, are prima facie evidence that the City does not adequately discipline misbehaving officers or provide adequate training to correct misbehavior.  These examples are particularly egregious, given that, in October 2018, the City entered into a settlement of an action, captioned *Ruben An v. the City of New York*—a case that dealt squarely with the City and NYPD's custom of violating the public's right to record the police—in which the NYPD agreed to conduct trainings about the public's right to record police activity and represented that

---

[34] New York Civilian Complaint Review Board, *Worth a Thousand Words: Examining Officer Interference with Civilian Recordings of Police*, June 2017, at 1-2.
[35] *Id*. at 34.

members of the NYPD would purportedly again be apprised of the content of an internal NYPD "Finest Message" addressing "Recording of Police Action by the Public."[36]

89.    Nonetheless, despite the City's and the NYPD's stated commitments in the *Ruben An* settlement, the NYPD's custom of violating such rights has since continued unabated.[37] Indeed, Ms. Vazquez's arrest in February of 2019 took place just months after the City entered into the *Ruben An* settlement.  And, as detailed above, Ms. Vazquez's unlawful arrest is far from an anomaly; the plethora of post-*Ruben An* lawsuits further detail the deliberate indifference of the City and NYPD to this pervasive and long-standing trampling of citizens' constitutional right to record the police, even after the NYPD agreed to conduct trainings to remedy this issue.

90.    The continued prevalence of these violations demonstrates that the City has not provided adequate or effective training to NYPD officers, or imposed adequate disciplinary procedures.  As a result of the City's deliberate indifference, City police officers, including Officers Cesar and Brewster, believe that their actions will not be properly monitored by supervisory officers and that misconduct will not be investigated or punished, but rather, tolerated and permitted to continue without consequence—fostering and perpetuating circumstances that allow NYPD officers' custom and practice of violating First Amendment rights to continue unchecked.

---

[36] *Ruben An. v. City of New York*, No. 16-cv-05381 (S.D.N.Y. filed July 6, 2016).
[37] *See supra* at 27-30.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION (AS TO DEFENDANTS CESAR AND BREWSTER)
### (DEPRIVATION OF FEDERALLY PROTECTED RIGHT UNDER § 1983)
### *RETALIATION FOR RIGHT TO RECORD POLICE ACTIVITY*
### *(FIRST AMENDMENT VIOLATION)*

91.     Plaintiff adopts and incorporates by reference, paragraphs 1 through 90 as if set forth herein at length.

92.     Observing and recording police activity in public is of fundamental importance to our society and is protected by the First Amendment to the United States Constitution, as applied to the State of New York under the Fourteenth Amendment.

93.     By arresting and detaining Ms. Vazquez without probable cause and in retaliation for recording police activity in public, Defendants Cesar and Brewster violated Ms. Vazquez's First Amendment rights.

94.     As a direct and proximate result of these actions, Ms. Vazquez suffered damages, including impairment of her First Amendment rights, physical injuries, emotional distress, economic damages, and professional injuries.

95.     At all times, Defendants Cesar and Brewster were acting within the scope of their employment by the City of New York and under color of state law.

### SECOND CAUSE OF ACTION (AS TO THE CITY OF NEW YORK)
### (DEPRIVATION OF FEDERALLY PROTECTED RIGHT UNDER § 1983)
### *RETALIATION FOR RIGHT TO RECORD POLICE ACTIVITY*
### *(FIRST AMENDMENT VIOLATION)*

96.     Plaintiff adopts and incorporates by reference, paragraphs 1 through 90 as if set forth herein at length.

97.     By arresting and detaining Ms. Vazquez without probable cause and in retaliation for recording police activity in public, Defendants Cesar and Brewster violated Ms. Vazquez's First Amendment rights.

98.     At all times relevant to this Complaint, Defendants Cesar and Brewster were acting under color of state law.

99.     At all times relevant to this Complaint, the NYPD has had a widespread policy, custom and practice of targeting and/or arresting members of the public for recording police activity in public places in violation of the First Amendment to the United States Constitution.

100.     At all times relevant to this Complaint, the City of New York has been on notice that the NYPD has a widespread policy, custom and practice of targeting and/or arresting members of the public for recording police activity in public places, but has failed to rectify this unconstitutional policy, custom and practice, thereby demonstrating deliberate indifference to citizens' First Amendment rights.

101.     Despite this notice, the City of New York has failed to properly train NYPD officers about the First Amendment right of the public to record public scenes of police activity, thereby demonstrating deliberate indifference to citizens' constitutional rights.

102.     Despite this notice, the City has failed to supervise and discipline NYPD officers for unlawfully interfering with the First Amendment right of the public to record public scenes of police activity, thereby demonstrating deliberate indifference to citizens' constitutional rights.

103.     By its actions and inactions, the City of New York (through the NYPD) has implemented, enforced, encouraged, sanctioned and ratified policies, customs and practices that interfere with, and retaliate against, the exercise by citizens of their First Amendment right to record police activity in public places.  These actions and inactions caused the violations of Ms. Vazquez's First Amendment rights.

104.     These unconstitutional policies, customs and practices of the City of New York, acting through the NYPD, were the impetus behind violations by Defendants Cesar and Brewster

of Ms. Vazquez's constitutional rights as alleged herein, rendering the City liable to Ms.

Vazquez under 42 U.S.C. § 1983.

105.    As a direct and proximate result of the City's unconstitutional policies, customs

and practices, Ms. Vazquez suffered damages including impairment of her First Amendment

rights, physical injuries, emotional distress, economic damages, and professional injuries.

**THIRD CAUSE OF ACTION (AS TO DEFENDANTS CESAR AND BREWSTER)**
**(DEPRIVATION OF FEDERALLY PROTECTED RIGHT UNDER § 1983)**
***FALSE ARREST/FALSE IMPRISONMENT***
***(FOURTH AMENDMENT VIOLATION)***

106.    Plaintiff adopts and incorporates by reference, paragraphs 1 through 90 as if set

forth herein at length.

107.    Under the Fourth Amendment to the United States Constitution, as applied to the

State of New York under the Fourteenth Amendment, Ms. Vazquez has a right to be free from

arrest without probable cause and from unreasonable searches and seizures.

108.    By arresting and detaining Ms. Vazquez for a period of over 13 hours, searching

her person, and seizing her iPhone without probable cause to believe she engaged in any criminal

activity, Defendants Cesar and Brewster violated Ms. Vazquez's Fourth Amendment rights

109.    As a direct and proximate result of these actions, Ms. Vazquez suffered damages,

including impairment of her Fourth Amendment rights, physical injuries, emotional distress,

economic damages, and professional injuries.

110.    At all times, Defendants Cesar and Brewster were acting within the scope of their

employment by the City of New York and under color of state law.

**FOURTH CAUSE OF ACTION (AS TO THE CITY OF NEW YORK)**
**(DEPRIVATION OF FEDERALLY PROTECTED RIGHT UNDER § 1983)**
***FALSE ARREST/FALSE IMPRISONMENT***
***(FOURTH AMENDMENT VIOLATION)***

111.    Plaintiff adopts and incorporates by reference, paragraphs 1 through 90 as if set forth herein at length.

112.    By arresting and detaining Ms. Vazquez for a period of over 13 hours, searching her person, and seizing her iPhone without probable cause to believe she engaged in any criminal activity, Defendants Cesar and Brewster violated Ms. Vazquez's Fourth Amendment rights

113.    At all times relevant to this Complaint, Defendants Cesar and Brewster were acting under color of state law.

114.    At all times relevant to this Complaint, the NYPD has had a widespread policy, custom and practice of targeting and/or arresting members of the public for recording police activity in public places in violation of the Fourth Amendment to the United States Constitution.

115.    At all times relevant to this Complaint, the City of New York has been on notice that the NYPD has a widespread policy, custom and practice of targeting and/or arresting members of the public for recording police activity in public places, but has failed to rectify this unconstitutional policy, custom and practice, thereby demonstrating deliberate indifference to citizens' Fourth Amendment rights.

116.    Despite this notice, the City of New York has failed to properly train NYPD officers about the Fourth Amendment right of the public to be free from unlawful detainment and arrest for recording public scenes of police activity, thereby demonstrating deliberate indifference to citizens' constitutional rights.

117.    Despite this notice, the City has failed to supervise and discipline NYPD officers for unlawfully interfering with the Fourth Amendment right of the public to be free from

unlawful detainment and arrest for recording public scenes of police activity, thereby

demonstrating deliberate indifference to citizens' constitutional rights.

118.     By its actions and inactions, the City of New York (through the NYPD) has

implemented, enforced, encouraged, sanctioned and ratified policies, customs and practices that

interfere with citizens Fourth Amendment right to be free from unlawful detainment and arrest

for recording public scenes of police activity.  These actions and inactions caused the violations

of Ms. Vazquez's Fourth Amendment rights.

119.     These unconstitutional policies, customs and practices of the City of New York,

acting through the NYPD, were the impetus behind violations by Defendants Cesar and Brewster

of Ms. Vazquez's constitutional rights as alleged herein, rendering the City liable to Ms.

Vazquez under 42 U.S.C. § 1983.

120.     As a direct and proximate result of the City's unconstitutional policies, customs

and practices, Ms. Vazquez suffered damages including impairment of her Fourth Amendment

rights, physical injuries, emotional distress, economic damages, and professional injuries.

**FIFTH CAUSE OF ACTION (AS TO DEFENDANT JANE DOE)**
**(DEPRIVATION OF FEDERALLY PROTECTED RIGHT UNDER § 1983)**
***EXCESSIVE USE OF FORCE***
***(FOURTH AMENDMENT VIOLATION)***

121.     Plaintiff adopts and incorporates by reference, paragraphs 1 through 90 as if set

forth herein at length.

122.     Under the Fourth Amendment to the United States Constitution, as applied to the

State of New York under the Fourteenth Amendment, Ms. Vazquez has a right to be free from

the excessive use of force.

123.    Defendant Jane Doe violated Ms. Vazquez's Fourth Amendment rights in using force that was excessive and objectively unreasonable in handcuffing Ms. Vazquez and refusing her reasonable request to loosen the cuffs.

124.    As a direct and proximate result of these actions, Ms. Vazquez suffered damages, including impairment of her Fourth Amendment rights, physical injuries, emotional distress, economic damages, and professional injuries.

125.    At all times, Defendant Jane Doe was acting within the scope of her employment by the City of New York and under color of state law.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

(a)    Compensatory damages, in amounts to be determined at trial;

(b)    Punitive damages, in amounts to be determined at trial;

(c)    Attorney's fees and costs of this action; and

(d)    Such other and further relief as the Court deems just and proper.

[Remainder of Page Intentionally Blank]

Dated:   New York, New York
         January 27, 2022

                                      Respectfully submitted,

                                      DAVIS POLK & WARDWELL LLP

                                      By: /s/ Brian M. Burnovski

                                      Brian M. Burnovski
                                      brian.burnovski@davispolk.com
                                      Diane O. Lucas
                                      diane.lucas@davispolk.com
                                      Brendan A. Blase
                                      brendan.blase@davispolk.com
                                      Matthew Stratis Vasilakos
                                      matthew.vasilakos@davispolk.com

                                      450 Lexington Avenue
                                      New York, New York  10017
                                      (212) 450-4000

                                      THE LEGAL AID SOCIETY
                                      Barbara P. Hamilton
                                      bphamilton@legal-aid.org
                                      199 Water Street
                                      New York, NY  10038
                                      (212) 577-3391

                                      *Attorneys for Plaintiff Robbin Vazquez*